**Opinion issued July 21, 2026**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-26-00128-CV**

———————————

## IN THE INTEREST OF C.K.J.-S., A CHILD

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-00498J**

---

## MEMORANDUM OPINION

Following an order naming the Texas Department of Family and Protective Services as the sole managing conservator of C.K.J.-S. (Connor) and naming S.S.J. (Mother) as Connor's possessory conservator, the Department moved for modification of the order and sought termination of Mother's parental rights to

Connor.[1] The trial court held a bench trial and found, by clear and convincing evidence, that termination of Mother's parental rights was warranted based on three statutory predicate grounds and was in Connor's best interest.[2] *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O), (b)(2).

Mother raises five issues on appeal. She first argues that the trial court erred by admitting and considering evidence from before the trial proceeding that led to the conservatorship order modified in the underlying trial. She next argues that the court erred by terminating her parental rights under subsection (O) because the Department pleaded for termination based on the former subsection (O), but following a change in the law, the court terminated Mother's rights based on the current subsection (O). Finally, in her remaining three issues, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings on subsection (D), subsection (E), and Connor's best interest.

We affirm.

---

[1]    In this opinion, we use pseudonyms for the minor child and his family members to protect their privacy. *See* TEX. R. APP. P. 9.8(b)(2).

[2]    The trial court also terminated the parental rights of C.M.-C.E. (Father) based on Father's execution of an irrevocable affidavit relinquishing his parental rights to Connor. *See* TEX. FAM. CODE § 161.001(b)(1)(K). Father is not a party to this appeal.

2

## Background

Mother has three living children: an adult daughter; a daughter born in 2011; and Connor, who was born in January 2022.[3] Although Mother retains her parental rights to her minor daughter, a relative has had sole managing conservatorship over that daughter (and Mother's older daughter, while she was still a minor) since January 2021. At some point after his birth, Connor began living with this relative as well after Mother experienced suicidal ideation and went to a psychiatric hospital. Connor is the only child involved in this proceeding.

The events leading to initiation of this proceeding began in December 2022, when Connor was eleven months old. The relative caring for all three of Mother's children reported that Mother had recently learned her address and began harassing her and threatening violence to make the relative give custody of the oldest child back to Mother. The relative refused because of Mother's drug abuse history and erratic behavior: Mother appeared under the influence of drugs; she threatened to kill the relative; and she "even got into it with law enforcement when they escorted mother off the premises." Mother had "a history of mental health concerns" and refused to take her medication. She also had made threats of suicide to her daughters

---

[3] The appellate record reflects that Mother had a third daughter, but this daughter is deceased. The record contains limited information about this daughter and her death.

and to the relative. The relative was "very fearful of mother and what mother might do."

The Department investigated over the course of several months. During this time, Mother completed a drug test at the Department's request, and she tested positive for PCP. The relative contacted the Department investigator on several occasions and reported that Mother was harassing her and threatening her with violence. Based on Mother's behavior, her history with the Department (which led to the removal of her daughters from her home and their placement with the relative), her documented history of PCP use, her mental health concerns, and her criminal history (which included convictions for theft, DWI, possession of a controlled substance, terroristic threat, and assault), the Department was concerned about Mother's ability to provide a safe environment for Connor. The Department filed suit in March 2023 seeking managing conservatorship over Connor and, alternatively, termination of Mother's parental rights. As the case moved forward, Connor resided with his paternal grandmother.

The trial court held a bench trial in February 2024. In between initiation of this proceeding and the 2024 trial, Mother had completed inpatient substance abuse treatment and some of the tasks required by her family service plan, including parenting classes and individual therapy. In April 2024, the court found that appointing Mother as a managing conservator of Connor would not be in his best

interest. However, it did not terminate Mother's parental rights. Instead, it named the Department as Connor's sole managing conservator and named Mother as his possessory conservator.

A year later, the Department moved to modify the conservatorship order, alleging that "[t]he circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the date of the rendition of the order." The Department sought termination of Mother's parental rights based on three relevant statutory predicate grounds: subsection (D), subsection (E), and former subsection (O) relating to failure to comply with a court order.

Three witnesses testified at the trial on the Department's modification petition: Ashley Craft, the Department caseworker; Mother; and Connor's paternal grandmother, who had had custody of him since July 2023. At the beginning of the trial, the Department offered 17 exhibits—including exhibits that contained evidence relating to events that occurred prior to the 2024 trial, such as the removal affidavit, Mother's family service plan evaluations, and drug testing results—into evidence. Mother did not object to admission of these exhibits.

Craft testified that the Department had been concerned about Mother's substance abuse throughout the case, and Mother did not alleviate this concern. Although she successfully completed treatment at an inpatient facility, Mother began testing positive for PCP again in late 2024. Mother's recent criminal history included

a conviction for the misdemeanor offense of harassing communication in May 2023; a third-degree felony conviction for DWI (involving intoxication due to PCP) in July 2023; and a state-jail felony conviction for theft in April 2025. At the time of trial in November 2025, Mother was incarcerated, and following her expected release in early 2026, she would remain on community supervision until 2029. While incarcerated, Mother was participating in a substance abuse treatment program, individual counseling, group counseling, and anger management classes. The Department believed that termination of Mother's parental rights was in Connor's best interest due to Mother's substance abuse history, her relapses even after completing treatment programs, and her criminal history.

Mother disputed the 2024 drug testing results, stating that she had not used PCP since her release from inpatient substance abuse treatment. At the time of trial, she was incarcerated in a "Substance Abuse Felony Punishment" unit. Mother had not "gotten in any trouble here," so she had not been asked to take any drug tests while at the facility. Mother was involved in the "Big Sister" program at the facility, and her responsibilities included teaching classes and acting as a "positive peer" for other women struggling with substance abuse. She served in this role for most of 2025. Mother acknowledged her prior drug history, but she insisted that her drug use was in the past, and she was not willing to jeopardize her relationship with Connor by continuing to use drugs.

Connor's current caregiver, his paternal grandmother, testified that he was a "great kid," a "happy-go-lucky kid, very loving." Connor was three years old and had some behavioral issues: he experienced rage that was more intense than a typical tantrum, and he had been suspended from daycare on several occasions for biting, kicking, fighting, and throwing things at teachers. He had also been diagnosed with "mild autism and a high level of ADHD." He participated in play therapy and virtual therapy with a psychiatrist. Connor's grandmother loved him and planned to adopt him.

After trial, the trial court signed an order modifying the April 2024 conservatorship order and finding that "the circumstances of the Child Conservators or other party affected by the prior [conservatorship] order" had materially and substantially changed. The court further found that three statutory predicate grounds justified termination of Mother's parental rights—subsection (D), subsection (E), and current subsection (O) relating to abuse of a controlled substance—and that termination of her parental rights was in Connor's best interest. The court named the Department as Connor's sole managing conservator. This appeal followed.

## Admission of Evidence

In her first issue, Mother argues that the trial court erred by admitting and considering evidence from before the 2024 termination trial because the Department pleaded for relief under the statutory provisions applicable to modification petitions

7

in suits affecting the parent–child relationship generally, but did not plead for relief under a Family Code provision specifically applicable to termination proceedings following an order denying termination of the parent-child relationship. Mother argues that because the Department did not plead for relief under the more specific provision, she did not have notice that the Department would seek to admit evidence from the 2024 termination trial or before that date.

Family Code section 161.004 allows termination of parental rights following rendition of an order that previously denied termination if the Department satisfies four criteria:

(1)     the Department files its petition under section 161.004 after the date the trial court rendered the order denying termination;

(2)     the circumstances of the child, parent, sole managing conservator, possessory conservator, or other affected party have materially and substantially changed since rendition of the order denying termination;

(3)     the parent committed a predicate ground for termination before rendition of the order denying termination; and

(4)     termination is in the child's best interest.

TEX. FAM. CODE § 161.004(a). At a hearing under section 161.004, "the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child." *Id.* § 161.004(b).

Courts have held that while the Department can seek termination following rendition of a prior order denying termination under either section 161.004 or the usual section 161.001(b), if the Department chooses the section 161.004 route, it must plead that section as a basis for termination. *See, e.g.*, *In re K.G.*, 350 S.W.3d 338, 352 (Tex. App.—Fort Worth 2011, pet. denied); *In re K.P.*, 498 S.W.3d 157, 170 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). "When the Department does not plead section 161.004 as grounds for termination, it is error to admit evidence from before a prior decree denying termination." *In re K.P.*, 498 S.W.3d at 170. However, the Department need not specifically name section 161.004 in its pleadings so long as its modification petition alleges the required statutory elements of that section. *See In re A.A.M.*, 464 S.W.3d 421, 425 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("Broadly construing the petitions in the absence of a special exception, the Department's pleadings notified the father that his earlier conduct would be at issue.").

In *In re A.A.M.*, the Department sought termination of a father's parental rights to his two children. *Id.* at 423. The trial court did not grant the request for termination, but it did name the Department as the children's sole managing conservator. *Id.* A year later, the Department moved to modify the conservatorship order and again sought termination of the father's rights. *Id.* The Department's modification petition did not expressly name section 161.004. *Id.* at 425. We held,

9

however, that the modification petition encompassed section 161.004 because the Department "pleaded the statutory elements for modification of an earlier order, including materially changed circumstances" and pleaded that "the orders are in the best interest of the children." *Id.* We further noted that the father did not specially except to the Department's modification petition, waiving "any complaint about the perceived lack of notice from the omission of a specific reference to section 161.004 in the pleadings." *Id.* Nor did he object to admission of his drug test results, evidence concerning events that occurred prior to the previous order denying termination. *Id.*

The Department's modification petition in this case is substantively identical to the modification petition in *In re A.A.M.* that we found sufficiently encompassed section 161.004. The modification petition identified the prior order to be modified: the "'Decree in Suit Affecting the Parent Child Relationship,' signed on the 2nd day of April, 2024." It alleged that "[t]he circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the date of the rendition of the order." And in seeking termination of Mother's parental rights, it alleged that Mother had violated several statutory predicate grounds and that termination was in Connor's best interest.

Moreover, as in *In re A.A.M.*, Mother's counsel did not specially except to the Department's modification petition. Nor did counsel object at trial when the Department offered 17 exhibits into evidence, some of which (such as the removal

10

affidavit and portions of Mother's drug testing results) referenced information from before the 2024 trial. Instead, Mother's counsel stated that he had no objections to admission of the exhibits. Counsel did not, at any point during the trial, challenge the sufficiency of the Department's modification petition or argue that Mother had not received notice that the Department would rely upon exhibits referencing facts from before the 2024 trial. Neither Mother's trial counsel nor her appointed appellate counsel filed any post-termination-decree motions arguing lack of notice, challenging sufficiency of the Department's pleadings, or arguing that the trial court improperly admitted and considered evidence from before the 2024 trial.

We conclude that the Department's modification petition encompassed the statutory elements of section 161.004, and the trial court did not err by considering evidence from before the first termination trial in 2024.

We overrule Mother's first issue.

**Pleading of Predicate Ground (O)**

In her second issue, Mother argues that the Department did not properly plead for termination based on subsection (O), and therefore the trial court erred by finding that Mother violated this predicate ground.

The Department moved to modify the conservatorship order in April 2025, and it asserted that Mother had violated several statutory predicate grounds for termination, including subsection (O). At the time the Department filed its

modification petition, subsection (O) allowed a trial court to terminate a parent's rights if it found by clear and convincing evidence that the parent:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

*See* Act of May 24, 2005, 79th Leg., R.S., ch. 508, § 2, sec. 161.001(b)(1), 2005 Tex. Gen. Laws 1395, 1396 (amended 2025). The modification petition tracked this statutory language.

During the 2025 legislative session, the Texas Legislature amended section 161.001(b)(1) to remove that basis as a predicate ground supporting termination and renamed the remaining predicate grounds. *See* Act of May 14, 2025, 89th Leg., R.S., ch. 211, H.B. 116, § 2, sec. 161.001(b)(1) (to be codified as an amendment to Tex. Fam. Code § 161.001(b)(1)). This amendment became effective on September 1, 2025, and applied to suits pending in a trial court on that date, including this suit to terminate Mother's parental rights. *See id.* §§ 3–4. Thus, after September 1, 2025, subsection (O) allowed termination if the court found that the parent

> used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and:
>
> > (i)     failed to complete a court-ordered substance abuse treatment program; or

12

> (ii) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance.

Tex. Fam. Code § 161.001(b)(1)(O). The Department did not amend its modification petition to reflect this change to subsection (O). The trial court's order granting the Department's modification petition and terminating Mother's parental rights tracked the statutory language of current subsection (O), not former subsection (O), which had been pleaded by the Department but subsequently repealed by the legislature.

Mother argues that due to the change in law and the Department's failure to amend its modification petition accordingly, she "was without proper notice of the ground for termination which was allegedly found by the trial court" and included in the termination decree. The Department concedes that Mother is correct and that the trial court erred by basing the termination order, in part, on subsection (O).

We agree. *See Vasquez v. Tex. Dep't of Protective & Regul. Servs.*, 190 S.W.3d 189, 194 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("[A] parental-rights-termination order can be upheld only on grounds both pleaded by [the Department] and found by the trial court."); *Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 251 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc) (same); *see also In re S.M.R.*, 434 S.W.3d 576, 581 (Tex. 2014) (disagreeing that *Vasquez* line of cases conflicts with supreme court

13

precedent). We conclude that the trial court erred by terminating Mother's parental rights based on current subsection (O) in the absence of pleadings alleging this predicate ground. However, this is not the end of our inquiry because the trial court also based its termination decree on two other predicate grounds: subsections (D) and (E). We therefore turn to Mother's challenges to those two grounds and to the best-interest finding.

## Sufficiency of Evidence

In her third, fourth, and fifth issues, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings that termination of her parental rights was warranted under subsections (D) and (E) and that termination was in Connor's best interest.

## A.    Standard of Review

We apply a well-established standard when reviewing the sufficiency of evidence supporting a trial court's findings terminating parental rights. Because the rights involved are of a constitutional magnitude, due process requires both a heightened burden of proof at trial—clear and convincing evidence—and a heightened standard of review on appeal. *See* TEX. FAM. CODE § 101.007 (defining "clear and convincing evidence"); *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024) (per curiam).

When conducting a legal sufficiency review of termination findings, we consider all the evidence in the light most favorable to the finding to determine whether a factfinder could have reasonably formed a firm belief or conviction about the truth of the Department's allegations. *In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024); *In re C.E.*, 687 S.W.3d at 308. We may not disregard undisputed evidence even if that evidence is inconsistent with the finding. *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022).

When reviewing the findings for factual sufficiency, we weigh disputed evidence contrary to the finding against all evidence favoring the finding to determine whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). The evidence is factually insufficient if the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.*

Despite the heightened standard of appellate review, we still must defer to the factfinder who heard the witnesses and evaluated their credibility. *In re J.F.-G.*, 627 S.W.3d 304, 311–12 (Tex. 2021). We may not substitute our judgment for that of the factfinder. *In re C.E.*, 687 S.W.3d at 309.

## B. Endangerment Findings

The trial court may terminate a parent's rights to her minor child if the court finds by clear and convincing evidence that the parent (1) knowingly placed or allowed the child to remain in conditions or surroundings which endanger the child's physical or emotional well-being, or (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the child's physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(D), (E). Subsection (D) "focuses on the child's environment," and relevant considerations include "[t]he suitability of the child's living conditions and the conduct of parents or others in the home." *In re J.W.*, 645 S.W.3d at 749. Subsection (E) requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re R.R.*, 711 S.W.3d 126, 139 (Tex. App.—Houston [1st Dist.] 2024, no pet.).

A child need not suffer actual injury or harm for a parent's conduct to be endangering. *In re R.R.A.*, 687 S.W.3d at 277; *In re J.F.-G.*, 627 S.W.3d at 312 (stating that endangering conduct need not be directed at child). "Instead, endangerment encompasses a larger array of conduct that 'expose[s a child] to loss or injury' or 'jeopardize[s]' the child." *In re R.R.A.*, 687 S.W.3d at 277 (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Because endangering conduct is not limited to actions directed towards the child, such conduct "may include the parent's actions before the child's birth, while the parent

16

had custody of older children." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). A factfinder may infer endangerment from a parental course of conduct that presents substantial risks to the child's physical or emotional well-being. *In re R.R.A.*, 687 S.W.3d at 277. These risks "must be more than 'a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.'" *Id.* (quoting *Boyd*, 727 S.W.2d at 533).

In determining whether the Department presented sufficient evidence of the endangerment grounds, courts may consider evidence of a parent's illegal drug use. *In re J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."). Although illegal drug use alone may not be sufficient to show endangerment, "a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm." *In re R.R.A.*, 687 S.W.3d at 278. We do not evaluate evidence of drug use in isolation. *Id.* Instead, we must consider whether additional evidence exists that demonstrates drug use "presents a risk to the parent's 'ability to parent.'" *Id.* (quoting *In re J.O.A.*, 283 S.W.3d at 345). We conclude that such evidence exists in this case.

The removal affidavit, admitted into evidence, details Mother's history with the Department. The first referral involving Mother occurred in 2007, and the first referral involving allegations of illegal drug use occurred in 2016:

The referral states mother, paramour, and uncles all use cocaine, weed, PCP, ecstasy, pills, [and] droll (a very potent type of marijuana). The referral states drug use in the household is on a daily basis. The referral states drug use occurs in front of the oldest victim and sibling [Mother's daughters]. The referral states all the adults stay high every day. The referral states all the adults have been observed smoking marijuana in front of the oldest victim and sibling. The referral states if you walk in front of the door, you can smell the drugs.

Following investigation, the Department requested that Mother complete family-based services.

Two years later, in 2018, the Department received another referral alleging that Mother "exposes [her daughters] to drugs and domestic situations." Specifically, Mother and the children were seen in a car parked in the driveway of a house that was a known location for the purchase of PCP. The person making the referral "states mother had either just smoked PCP or she was in the house where people [were] smoking PCP and the smell got on mother's person," and the person was concerned about the children's presence and their possible exposure to PCP. The Department initiated conservatorship proceedings for the daughters, which culminated in the trial court signing an order in 2021 relating to conservatorship of the girls. Mother retained her parental rights to her daughters, but a relative was named sole managing conservator for the girls, and Mother was named possessory conservator. Connor

was born in January 2022. At some point in 2022, Connor began living with his older sisters at their relative's house.[4]

In December 2022, the Department began investigating after receiving a report that Mother had learned of the caregiver's address and "has been harassing and threatening" the caregiver to return Mother's oldest daughter. The caregiver refused because of Mother's history of drug abuse. Mother repeatedly texted the caregiver, threatened to kill her, "got into it with law enforcement when they escorted mother off the premises," and appeared to be under the influence of drugs. Mother had threatened to hurt herself and had threatened suicide "in front of the children." The caregiver was afraid of her and "what mother might do."

The Department investigated for over three months. During that time, the caregiver reported on several occasions that Mother repeatedly called her while under the influence of drugs and threatened violence to force the caregiver to return Connor to Mother. On one occasion, Mother "bust [the caregiver's] windows out while she was working." In conversations with the Department investigator, Mother acknowledged that she had been using PCP. Mother also stated that she "tried to

---

[4]     It is possible this occurred in May or June 2022. The removal affidavit reflects that the Department received two referrals concerning Mother and Connor in May and June 2022. In the May referral, Mother reported that she "was about to commit suicide," and in the June referral she reported that she was "unstable" and could not care for Connor. Following the June referral, police responded and took Mother to a hospital. Mother "appeared to be high, which was already obvious."

harm herself because [Connor] was stolen from her," and she insisted on getting Connor back without Department assistance. Mother's behavior during the investigation was erratic, and she repeatedly stated that the caregiver was trying to steal Connor from her, and she did not know who to trust.[5] Mother tested positive for PCP during the investigation.

The record contains drug testing results that were positive for PCP dating back to 2019. Mother participated in inpatient substance abuse treatment in 2023 and early 2024, and her drug test results from this period were mostly negative. However, her hair sample taken in October 2024 tested positive for PCP, as did a urine sample collected in December 2024. Mother did not complete any further drug testing for the Department, largely due to her incarceration throughout much of 2025.

The trial court also had evidence before it concerning Mother's criminal history. The history included convictions—mostly for misdemeanors—dating back to 2006. Two of Mother's misdemeanor convictions were for assault, including one involving family violence. She also had a felony conviction for PCP possession in 2012 and a felony DWI conviction, which Mother testified was based on PCP and not alcohol intoxication, in 2023. Following the DWI conviction, Mother was placed on community supervision for four years with the requirement that she complete

_____

[5]     The removal affidavit reported that Mother filed a civil suit against the caregiver, which prevented the caregiver from obtaining a protective order against Mother in response to Mother's threats of violence.

inpatient substance abuse treatment. When Mother was convicted of a felony theft offense almost two years later in 2025, the criminal court amended the community supervision conditions to require participation in a substance abuse felony punishment facility and extended the term of supervision until 2029.

We are mindful that incarceration, standing alone, does not "constitute engaging in conduct which endangers the emotional or physical well-being of a child." *In re J.F.-G.*, 627 S.W.3d at 312–13 (quotation omitted). Incarceration may, however, support an endangerment finding "if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child." *Id.* at 313 (quotation omitted). Relevant considerations include the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists. *Id.*

Here, Mother had thirteen convictions over twenty years. Although none of the convictions had lengthy sentences of confinement, the convictions nevertheless led to periods in which Mother was absent from her children's lives. *See In re T.G.R.-M.*, 404 S.W.3d 7, 15 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (noting that even though criminal charges against mother were ultimately dismissed, "each time the mother was jailed, she was absent from [the child's] life and was not able to provide for [the child's] physical and emotional needs"). Moreover, two of Mother's criminal offenses involved assaultive conduct and two others were related to PCP

21

possession and intoxication, an additional way in which Mother's struggles with illegal drugs impacted her life and ability to parent.

In sum, the trial evidence included more than isolated positive drug test results untethered to any effect on Mother's children. Two of Mother's criminal convictions were drug related. The record contained allegations that Mother used PCP while caring for, and in the presence of, her older daughters. The record also included allegations that Mother was using PCP while harassing and threatening Connor's caregiver with violence. After a period of sobriety, Mother began testing positive for PCP again, leading to the Department's decision to seek modification of the prior conservatorship order. This evidence, which the trial court reasonably could have credited, "demonstrates that illegal drug use presents a risk to [Mother's] ability to parent." *See In re R.R.A.*, 687 S.W.3d at 278 (quotation omitted). We conclude, when considering the evidence in the light most favorable to the findings, that the trial court reasonably could have formed a firm belief or conviction about the truth of the Department's endangerment allegations. *See id.* at 276.

At trial, Mother acknowledged her prior history of PCP use but disputed the October and December 2024 positive results, testifying that she requested retesting because she knew she had not taken PCP. Mother also testified that she had been in a substance abuse felony punishment facility for several months, and she served in a leadership and teaching role at the facility, indicating that she was taking positive

steps toward maintaining sobriety. Mother agreed that her current incarceration had helped her "conclude that drugs aren't good and [she was not] going to take them anymore," and she did not wish to jeopardize her relationship with her children by continuing to use drugs.

As the factfinder, it was the province of the trial court to evaluate Mother's credibility, and it could have disbelieved Mother's testimony and believed the documentary evidence reflecting Mother's positive drug test results in October and December 2024. *See In re S.C.F.*, 522 S.W.3d 693, 703 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (stating that trial court could have credited child advocate's testimony and "the lab reports over the father's denials and claim of a 'false test'"). The court also could have weighed Mother's testimony about her recent improvement against her drug use history and concluded that while her progress was significant, it did not "conclusively negate the probative value of a long history of drug use and irresponsible choices." *See In re J.O.A.*, 283 S.W.3d at 346. We conclude that the disputed evidence that a reasonable factfinder could not have credited in favor of the endangerment findings is not so significant that the factfinder could not have formed a firm belief or conviction that the findings were true. *See In re A.C.*, 560 S.W.3d at 631.

We hold that legally and factually sufficient evidence supports the trial court's findings under subsections (D) and (E), and we therefore overrule Mother's third and fourth issues.

## C.     Best-Interest Finding

To terminate a parent's rights, the trial court must also find by clear and convincing evidence that termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b)(2). This is a "child-centered" inquiry that focuses on the child's well-being, safety, and development. *In re J.W.*, 645 S.W.3d at 746 (quoting *In re A.C.*, 560 S.W.3d at 631). We consider a nonexclusive set of factors in making this determination, including:

- the desires of the child;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parenting abilities of the individuals seeking custody;

- the programs available to assist those individuals to promote the child's best interest;

- the plans for the child by those individuals or the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and

- any excuse for the parent's acts or omissions.

24

*Id.* (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). The Department is not required to prove all of these factors—known as the *Holley* factors—as a condition precedent to termination. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

When considering the *Holley* factors, we conclude that sufficient evidence supports the trial court's finding that termination of Mother's parental rights was in Connor's best interest.

As discussed above with respect to the endangerment findings, Mother had a history of illegal drug use and criminal offenses, both of which persisted throughout the pendency of this proceeding. Mother also engaged in harassing and threatening conduct directed toward Connor's caregiver, who believed that Mother was using PCP. This belief was confirmed when Mother tested positive for PCP during the initial phase of the Department's investigation. Mother tested positive for PCP later in the case, after she had completed inpatient substance abuse treatment. Mother was also convicted of two felony offenses during the proceeding: the 2023 DWI offense and the 2025 theft offense. At the time of trial in November 2025, Mother was incarcerated at a substance abuse felony punishment facility, with a projected release date in December 2025 or January 2026. The criminal court extended Mother's community supervision for the DWI offense to 2029.

This evidence is relevant not just to the endangerment findings but also to Connor's best interest. *See In re E.D.*, 682 S.W.3d 595, 607 (Tex. App.—Houston

[1st Dist.] 2023, pet. denied) (noting that while courts have discounted evidence of illegal drug use when not recent, "[a] continuing pattern of illegal drug use, however, implicates most of the *Holley* factors" and supports best-interest finding); *In re J.C.*, No. 01-25-00136-CV, 2025 WL 2109931, at \*11 (Tex. App.—Houston [1st Dist.] July 29, 2025, pet. denied) (mem. op.) ("A parent's inability to maintain a lifestyle free from arrests and incarcerations is relevant to the trial court's best-interest determination."); *In re E.S.T.*, No. 01-22-00404-CV, 2022 WL 17096713, at \*18 (Tex. App.—Houston [1st Dist.] Nov. 21, 2022, no pet.) (mem. op.) (considering parent's "continued criminal conduct" and noting that even charges that did not result in conviction were relevant for purposes of determining best interest). Evidence that Mother engaged in criminal conduct during this proceeding, threatened Connor's caregiver with violence, and used illegal drugs after completing inpatient substance abuse treatment supports the trial court's finding that termination of her parental rights was in Connor's best interest. *See In re J.C.*, 2025 WL 2109931, at \*12 (concluding that evidence of mother's drug use was relevant to multiple *Holley* factors, including parenting abilities, stability of home, child's present and future emotional and physical needs, and present and future physical danger to child).

Additionally, Connor was almost four years old at the time of trial and had spent minimal time in Mother's care. He was too young to express his desires about

26

his placement. When a child is too young to express his desires, the factfinder may consider that the child has bonded with his caregiver, is well-cared for by the caregiver, and has spent minimal time with a parent. *In re K.W.*, No. 01-23-00530-CV, 2024 WL 116938, at \*10 (Tex. App.—Houston [1st Dist.] Jan. 11, 2024, pet. denied) (mem. op. on reh'g); *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (same).

Connor moved from Mother's home to live with his older sisters at their caregiver's house at some point during his first year of life. Since July 2023, he has lived with his paternal grandmother. Connor was bonded with his grandmother, and he was doing well in that placement. He had contact with his extended family and his older sisters. Connor's grandmother loved him and intended to adopt him.

Mother visited Connor twice per month on average, and the Department transitioned to supervised home visits in September 2024. The Department planned to have unsupervised home visits beginning in October 2024, but Mother then tested positive for PCP. Mother's last visit with Connor occurred in November 2024, and that visit went well: Mother "brought him snacks and toys and was hands-on with him with playing and engaged with him," and the Department did not have any

27

concerns about Mother visiting with Connor. She did not visit him in 2025 due to her incarceration.[6]

Although Connor was doing well physically and developmentally, there were some concerns about his behavior, specifically his increasing physical aggression. His grandmother elaborated on this behavior:

> But outside of him going through the behavior, the rage and, you know, being like I have never seen a child being suspended from daycare. But [Connor] has been suspended numerous occasions from daycare for biting, kicking, and fighting, and throwing stuff at the teachers and, you know students. It's like a rage he's going through. It's not a tantrum. It's not a 3 year old temper tantrum where you can manipulate him or get him to calm down. Like, I mean, he's rage, where we have to go get him, like.
>
> And then when he calm down out it, it's like he don't even really know what went on. He's like—when you're talking to him about it, you know, try—you know, he'll be, like, to find out why he did what he did, it's like he don't even have the knowledge of—you know, what he did. But outside of getting him help for that, he's a great kid and he's doing good.

In response to other behaviors and at the behest of Connor's pediatrician, Connor's grandmother took him to a psychiatrist to be evaluated for autism spectrum disorder.

---

[6] The trial court heard disputed evidence concerning scheduling visits, particularly in the latter part of 2024 and early 2025. Although Mother was approved for visits three times per month, she ended up having visits twice per month due to her schedule. The Department caseworker agreed that this was a scheduling issue and not a lack of desire on Mother's part to see Connor. The caseworker also testified Mother had an issue with transportation and could not make it to a visit in late November, Mother did not schedule a visit for December, and her January visit was cancelled "due to her not confirming a visit." Mother testified that she "never would have given up three opportunities to see" Connor and that she "showed up at every visit."

The psychiatrist "evaluated him with a mild autism and a high level of ADHD." Connor participated in play therapy and virtual therapy with a psychiatrist. The caseworker agreed that Connor's grandmother had been "proactive" in seeking out resources and assistance.

In arguing that insufficient evidence supports the trial court's best-interest finding, Mother points out that she is bonded with Connor, Connor was bonded with his older sisters, and there was no evidence in the record that Mother lacked the ability to care for Connor. We do not dispute that Mother loves Connor and desires to remain a part of his life. However, we cannot ignore the evidence that Connor is a young, vulnerable age, Mother engaged in harassing and threatening conduct directed at Connor's initial caregiver, and Mother's struggles with illegal drug use and criminal conduct persisted throughout this proceeding.

When viewing the evidence in the light most favorable to the best-interest finding, we conclude that the trial court reasonably could have formed a firm belief or conviction that termination of Mother's parental rights was in Connor's best interest. Furthermore, although the record contains conflicting evidence relating to the child's best interest, the trial court had the opportunity to evaluate the credibility of the trial witnesses. We further conclude that the disputed evidence that a reasonable factfinder could not have credited in favor of the best-interest finding is not so significant that the factfinder could not have formed a firm belief or conviction

29

that the finding was true. We therefore hold that legally and factually sufficient evidence supports the trial court's best-interest finding.

We overrule Mother's fifth issue.

## Conclusion

We affirm the trial court's order modifying the April 2024 conservatorship decree and terminating Mother's parental rights to Connor.

David Gunn
Justice

Panel consists of Justices Guerra, Gunn, and Morgan.